**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **NATALIE MCDANIEL,** | ) | **CASE NO. 1:17-CV-00091** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **ROBERT WILKIE, Secretary of the** | ) | **PLAINTIFF'S MEMORANDUM  IN** |
| **Department of Veterans Affairs,** | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| **Defendant.** | ) | **JUDGMENT** |

There are a great number of disputes of material fact on this record; this Court must deny Defendant's Motion for Summary Judgment in its entirety, and permit this case to proceed to a jury trial.

## ISSUES TO BE DECIDED

1) Whether the VA is liable under Title VII for the harassment perpetrated by the Veterans Benefits Administration (VBA) Cleveland Regional Office (RO) managers, because it either knew, or should have known, that harassment and other hostile behaviors routinely occurred at the Cleveland RO.

2) Whether the VA violated the Rehabilitation Act by (a) refusing to accommodate McDaniel's request for 5 day per week telework despite repeated requests for an interim accommodation of just one additional day during the interactive process, and (b) offering McDaniel ineffective alternatives to telework and concurrently removing her from her routine 4 day per week telework and demanding she return to the Cleveland RO where it was impossible for McDaniel to work.

3) Whether the VA's unlawful actions resulted in McDaniel's constructive discharge.

## STATEMENT OF FACTS

Plaintiff Natalie McDaniel ("McDaniel") was employed by the Department of Veterans Affairs ("VA"), Veterans Benefits Administration ("VBA") from July 2007 to July 2015; during which at all times she was assigned to the Veterans Service Center ("VSC") division at one of the Nation's largest VA offices, the Cleveland Regional Office ("RO"). On or about November 2010 McDaniel was promoted to a decision-maker role (RVSR) on the VA Rating Board.

After coming forward and complaining to Cleveland RO management, without investigation or effective remedy, McDaniel exhibited signs of anxiety and posttraumatic stress disorder (PTSD),

and was ultimately diagnosed with PTSD in June 2014. (Exh. 5) McDaniel initially claimed (as it was her belief at the time) that she was the victim of workplace bullying, harassment, and sabotage, and then put RO management on notice that she believed a sexually hostile work environment was being created for black women by the Veterans Service Center Manager (VSCM) Charles L. Moore Jr. ("Moore"). (Defendant's Exhibit 2, Record of Investigation ("ROI") at 297-301, 427-429; Exh. 26; Exh. 85 p. 14, 69; Exh. 93)

Every time McDaniel arrived at the Cleveland RO, her PTSD symptoms were triggered and manifested in episodes of crying, being fearful, anxious, angry, depressed, and similar debilitating symptoms. (Exh. 5; Exh. 7; Spouse Dec., ¶ 7, 8)   While taking the elevator up to her work space on the 9th floor of the Anthony J. Celebrezze Federal Building, located on E. 9th St. in Cleveland, Ohio she would become fearful, her face would flush and hives would appear on her neck and chest, she could feel tightness in her chest, arms, and shoulders and would shake. (Exh. 5; Exh. 7; Spouse Dec. ¶ 5) While at the Cleveland RO, McDaniel would suffer fatigue, poor concentration, nausea, vomiting, intense anxiety, and hypervigilance. (McDaniel Deposition October 3, 2018 attached hereto as Plaintiff's Exh. 1 p. 258; Exh. 5; Exh. 7; Spouse Dec. ¶7, 8)  McDaniel made multiple visits to the Agency's EAP counselor Laura Scott ("Scott")[1] beginning on March 7, 2014. At one point in July 2014, McDaniel's licensed professional clinical counselor Sara Schrecengost ("counselor") spent two hours in discussion with Scott about whether McDaniel posed a threat to RO managers due to homicidal ideations expressed in session during the work day. (Exh. 6)

When leaving work in the middle of the day to report to counseling sessions McDaniel would present with significant symptoms to include flashbacks, physical reactivity, irritability, hypervigilance and a startled response. (Counselor Dec. Exh. 7) When leaving work for the day she

---

[1] In the course of discovery Plaintiff requested her EAP records located at the E.9th St. VA offices. Scott is a Cleveland VARO employee assigned to EAP counselor duties as an ancillary function. To date, Defendant has not produced the records in his custody. Various disputes concerning discovery persist in this case.

was unable to perform tasks of daily living such as sleeping and eating, she would return home in the evenings and would not leave her home on the weekends. McDaniel would experience nightmares about work and lived in constant fear of more and worse punishment from Cleveland RO managers; she was often in distress and inconsolable. (Spouse Dec. ¶7, 8) McDaniel's fellow EEO committee member, a 39 year old mother and woman of color (Hispanic), tragically took her own life after being accused of misrepresentation by RO managers who aggressively pursued discipline displaying zero objectivity. (Exh. Administration Investigation Board (AIB) Report at 28, 30; Spouse Dec. ¶9, Exh. 66) Similar charges were made against McDaniel almost two years to the day of her coworker's death. (ROI at 246-248, 258-292)

McDaniel requested a reasonable accommodation for her disability, produced medical information and was accommodated on July 3, 2014. (Exh. 12; Exh. 21) Upon suggestion from her counselor in June 2015, McDaniel made a reasonable accommodation request while on leave from work in hopes that she and VA "could come to an agreement about [her] working conditions." (Exh. 7; Exh. 13; Exh. 101) McDaniel knew that white women with performance averages similar to hers were not being targeted by Moore, were not removed from telework or threatened with removal, and instead were provided viable work which in turn increased their output while McDaniel received no support and entirely different instructions from Moore, through her supervisor Frank P. DiMarco ("DiMarco").  (McDaniel Dep. at 144, 180, 211; ROI at 164-165; ROI at 90 ¶6, Exh. 75; Exh.76)

McDaniel's performance was rated fully successful or above every month of every year she served at VA. McDaniel was never offered a Performance Improvement Plan (PIP). (Exh.82 p. 416) Defendant admits that all of McDaniel's fiscal year appraisals were fully successful or better, yet insists that she also had unsatisfactory performance. (Exh. 36; Exh. 55) This is both a practical and a logical impossibility. From a practical, performance appraisal standpoint, an employee is given only

one performance rating at a time, a rating of record, which Defendant agrees have all been fully successful or above. From a logical perspective, the definitions of the two descriptive terms are mutually exclusive and cannot simultaneously describe the performance of the same employee.

Further, it was no secret that VSCM Moore routinely mitigated performance to the fully successful level in writing during the time McDaniel is accused of having unsatisfactory performance. (Exh. 77; Exh. 78; Exh. 79; Exh. 80; Exh. 81, McDaniel Dep. 221-222) Mitigation was so common in fact that Moore's annual review was mitigated. (Exh. 69) Within 45 days of McDaniel's resignation, her first-line supervisor, DiMarco, was strongly encouraged by RO management to request immediate reassignment. Following the downgrade, he too was mitigated to the fully successful level for twelve months because his new division (Appeals) as a whole was successful. (Exh. 70, Exh. 57-57.1, Exh. 58)

When discussing McDaniel's performance, Defendant relies on evidence that has already been rebutted and has been shown to contain questionable data and various computational errors. (McDaniel Dep. at 126-133, 281; Exh. 85 p.7-10; Gov. Exs. "C", "D", "E", "F", "G", "H", "I", and "J") Defendant asserts that McDaniel's telework status was restored in August 2014 as a result of her output standard being mitigated, this is demonstrably false as McDaniel exceeded her performance standard during that time period and returned to telework based on actual output achieved. (McDaniel Dep. at 152-154; Exh. 92; Exh. 98) Gov. Ex. "D" does not contain the data Defendant cites. (Def. Mot. Doc #40-1, p.2) Further, calculation of McDaniel's "FYTD OUTPUT" in Gov. Ex. "C" is incorrect, misrepresenting her fiscal year to date performance. (McDaniel Dep. at 126-133) Defendant also incorrectly states that McDaniel's April 2014 outputs were at least in part why she was removed from telework effective March 31, 2014, which is impossible, Gov. Ex. "B" confirms the March date. (Exh. 59)

McDaniel was removed from telework without cause. The investigation did not require her presence in the office; the removal was never officially linked to discipline, and was executed without notice to her union. (ROI at 239) Concerning outputs, by November 2013 only 4.4 percent of the Cleveland RO's caseload was ready for decision by the 91 rating board members. In an attempt to generate sufficient work, RVSRs used screening to generate their own inventories. "[Screening] improved individual performance and raised employee morale to an all-time high." (Exh. 53; Exh. 52) Moore instructed that McDaniel not screen cases like all other RVSRs. (ROI at 256; Exh. 67)

Gov. Exhibits "E", "F", "G", "H", "I", and "J" all concern the same timeframe. Gov. Ex. "E" describes McDaniel's performance as unsatisfactory. Gov. Exhibits F, G, and H concern McDaniel's performance for the months of December 2014, January 2015, and February 2015 as recorded by her supervisor, by her signature all three documents were issued to McDaniel on March 12, 2015. Defendant ignores the "Comments:" section found on page 2 of each of his exhibits, "Since the service center met its production goal your output standard has been mitigated per the VSCM guidance for this period." (McDaniel Dep. at 208) This evidence cannot be used to support Defendant's claim that McDaniel had unsatisfactory performance. Various circumstances at the National level prompted the VSCM's decision to replace the output standard with a collective VSC wide output goal. (Exh. 63; Exh. 64; Exh. 65) Gov. Exhibits "I" and "J" concern March 2015 and May 2015 performance but were never issued to McDaniel, however, both include the same mitigation language on page 2. On multiple occasions McDaniel proactively reached out to management with concerns about being provided sufficient work and the opportunity to reach the individual output goal (even during the mitigation periods), but management did not follow up or provide support except to assure her that she was protected by mitigation and that she should continue the good business practice of supporting the station goals through mentoring the trainees

who replaced her journeyman counterpart, and remands, while her backlog cases were redistributed to others. There is no indication that DiMarco or other VA managers acknowledged this reality when making the decision to punish McDaniel. (McDaniel Dep. at 221-222, 225-226, Exh. 51; Exh. 99; Exh. 100)

McDaniel's April 2015 memorandum (Exh. 97), displays entirely different output numbers than those found in the grid on Gov. Ex. "E". Defendant now admits that eight years' worth of McDaniel's performance data has been deleted despite a litigation hold. Still, McDaniel's FYTD performance (based only on the faulty accounting Defendant has produced) would be at least 2.106, despite being recorded as 2.03, and also 1.72. (McDaniel Dep. at 126-133, 281; Exh. 25) Defendant produced performance data for a similarly situated white female RVSR showing a slightly lower output average of 2.06 for the same time period, with the same quality rating as McDaniel (100%); this employee did not receive a warning letter and was not removed from telework. (Exh. 76) Record evidence clearly shows that Moore invented the "letter of concern" McDaniel received, and did so after he set an arbitrary expectation for performance that was kept secret from McDaniel even after it was invented.  What isn't clear is if any one of the employees mentioned in the documents is McDaniel (names were redacted prior to production), if so, then Moore misrepresented her performance to his own managers in an effort to punish her. (Exh. 95; Exh. 96)

McDaniel's removal from her Agency's telework program is a pattern. The Defendant would prefer the Court views the removals occurring in both 2014 and 2015 as evidence in support of McDaniel's failure to be productive when working from home, yet offers no evidence of McDaniel's performance on the four days per week she was working from home versus the one day per week when she worked in the office. Further, requiring McDaniel to achieve a higher standard than employees working in the office is prohibited, only a "fully successful" (or equivalent) performance appraisal is required to telework. (Exh. 85 p. 88-89, 90) The removals were not justified, and the

6

record evidence supports this assertion, McDaniel contends that the removals (in the VSC only black women were removed in 2014; 2015),(McDaniel Dep. 180-181, Exh. 2 p. 180 ln.2) were a punishment exacted by a boss who routinely referred to himself as "Daddy". (McDaniel Dep. 55-56; Exh. 46) "[We] have rejected any conclusive presumption that an employer will not discriminate against members of his own race." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 78 (1998) Moore's lack of fidelity with his own race[2] isn't discrimination; attempting to demonstrate a lack of allegiance by isolating, sabotaging, and punishing the most vulnerable members of one's own race is race and gender based discrimination.

<u>LAW AND ARGUMENT</u>

I.      SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a) On the other hand, if a reasonable jury could return a verdict for the nonmoving party, summary judgment for the moving party is inappropriate. *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015) The movant bears the initial burden of showing that there is no material issue in dispute. *Id.* at 607 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) A fact is deemed material only if it might affect the outcome of the case under the governing substantive law. *Id.* (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994), in turn citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986)) In reviewing a motion for summary judgment, the court must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Id.* (citing *Kalamazoo Acquisitions, LLC v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005))

---

[2] Charles L. Moore Jr. identifies as Black male with a light complexion. (ROI at 180-181)

## III. THERE ARE SUFFICIENT MATERIAL FACTS TO SUPPORT A PRIMA FACIE CASE FOR HOSTILE WORK ENVIRONMENT

To make a prima facie case of hostile work environment, a plaintiff must show: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon the employee's protected status; (4) the harassment affected a term, condition or privilege of employment; and, (5) the employer knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Woods v. FacilitySource*, LLC, 640 Fed. Appx. 478, 490 (6th Cir. 2016)

The plaintiff must present evidence showing a prima facie case of discrimination. The burden then shifts to the defendant to articulate a nondiscriminatory reason for their actions. If the defendant can articulate a nondiscriminatory reason, the plaintiff is then given the opportunity to prove that the reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) *See also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007) (stating that "the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.") *Hamilton v. G. E. Co.*, 556 F.3d 428, 442 (6th Cir. 2009)

Defendant does not dispute McDaniel's membership in a protected class. Defendant excludes the words "or pervasive" when citing the opinion in *Harris*. This omission changes the meaning of the authority cited in an attempt to limit the Court's view of conduct which is pervasive enough to "create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) What McDaniel must show is that the harassment underlineunreasonably interfered with her work performance underline or created a hostile or offensive work environment that was underlinesevere or pervasive. *Young*

8

*v. McHugh*, 24 F. Supp. 3d 658, 666 (E.D. Mich. 2014) *citing Fenton v. Hisan, Inc.*, 174 F.3d 827 (6th Cir. 1999)

**A. The Work Environment Was Objectively Hostile.**

McDaniel's claim for hostile work environment goes beyond the incidents referenced by Defendant and includes conduct by several levels of VA management which directly and unreasonably interfered with her work performance. This included outright deletion of earned output credit which directly and negatively impacted McDaniel's performance (McDaniel Dep. at 127, 130, 145; Exh. 24; Exh. 87; Exh. 88), cutting job duties by removing her from a prestigious and professionally beneficial special project (Exh. 72; Exh. 90), disallowing her from "screening" cases for months (a tool that all other similar employees were allowed to benefit from) which had the effect of artificially depressing McDaniel's average output performance numbers (McDaniel Dep. at 153, 158-159, 185; ROI at 256, Exh. 85 p. 66; Exh. 102), and deliberately restricting the amount of viable cases McDaniel was allowed to work which would contribute to her output performance, despite repeated protests and pleas from McDaniel to provide sufficient work. (McDaniel Dep. at 156, 160, 163, 167, 212-214, 256, 269-270; Exh. 74; Exh. 83; Exh. 102)

Further, Defendant also made specious accusations of conduct violations against McDaniel (ROI at 258), initiated a months-long sham investigation into those accusations (ROI at 257, 266-281), during which time they unnecessarily revoked her ability to telework and work on a compressed schedule (both of which are widely used work/life programs intended to help employees manage work-life balance) (Exh. 67; Exh. 91; ROI at 237, 249), and then proposed an unpaid, ten-day suspension in response to uncorroborated allegations from Moore and Vinka M. Lasic ("Lasic") about whom McDaniel made multiple complaints to Human Resources, the Union, and upper management shortly before they made the accusations. (Exh. 85 p.14-15; Exh. 90; ROI at 246) This occurred from January 2014 through July 2014 while McDaniel was working under the

protection of a Memorandum of Understanding which mandated a six-month, non-punitive re-acclimation period for employees who participated in a work detail. (ROI at 251, 297; Exh. 62) For five months, despite repeated requests, McDaniel was not permitted to have a telephone at her desk like every other employee. (McDaniel Dep. 185-188, 235) McDaniel was isolated literally and figuratively, it was clear she was being punished which had the effect of undoing her perceived value within her work group. DiMarco yelled at her, challenged her assessments of cases in front of dismayed coworkers who at times tried to leap to her defense and often tried to console her when she was either angered or in tears afterwards. McDaniel took time away from work when she was overcome with emotion. McDaniel felt humiliated which contributed to her depression symptoms; McDaniel was formally diagnosed with Major Depressive Disorder single episode severe on May 9, 2015. (McDaniel Dep. 244; Exh. 9; Exh. 101)

Defendant states McDaniel "primarily complains about senior supervisor Charles Moore treating her 'inappropriately'" (Def. Mot. at 5 citing McDaniel Dep. at 36) and goes on to say that McDaniel cited "only a few discrete instances of alleged harassment." (Def. Mot. at 6) This is incorrect and incomplete. First, McDaniel's answer as cited by Defendant was in response to a question restricted to incidents between 2007 and 2010. (McDaniel Dep. at 36) Second, throughout the 7-hour deposition, McDaniel cited numerous ways that Defendant caused a hostile work environment by engaging in abusive conduct generally, against black female employees, and specifically against McDaniel that directly and unduly affected her work performance in an ongoing and continuous way by "disrupting their ability to work and be successful in an attempt to create a pattern of performance that would lead to the discipline that he wants to [impose] on this vulnerable class of women." (McDaniel Dep. at 180-182) McDaniel is intensely qualified to discern whether she is being leered at and sexualized versus being simply attended to in conversation.  Suffice to say,

McDaniel's subjective experience was one where she was objectified[3] (McDaniel Dep. 36-38) She was not alone in her assessment, in an instance where McDaniel decried her predicament "why is [Moore] doing this to me?" her union representative offered in not so many words that it was Moore's fixation with her appearance, and then promptly suggested an EEO complaint based on race and gender in the event she was suspended for ten days as it was Moore who had just proposed such. (*Id.* at 144) One of McDaniel's coworkers reached out to Moore early on to warn him that he was headed for a complaint if he didn't get his behavior in check, "I witnessed Charles Moore sexually harass female co-workers…During meetings Moore would spend almost the entire time staring at women's chests, behinds, and in between their legs. He did this on multiple occasions and it was blatantly obvious what he was doing. He would do this when women were walking down the hallway, in the team areas, and in the training room… I let him know that employees were starting to talk because of his sizing women up like he was at a strip club." (Exh. 46)

By 2012, the Cleveland RO was subject to an NCOD wellness check following an Administrative Investigation that was expanded to focused on Moore's behavior in particular, no remedial actions were taken; there is no record of Moore being disciplined despite cries to "hold management accountable." (Exh. 54 p. 50) McDaniel echoed this sentiment "Given the impunity that Mr. Moore seems to enjoy, I can never truly feel safe. Even now I am concerned about antagonizing Mr. Moore with the truth….[we are] the victims of steadfast neutrality…." (Exh. 85 p.70)

---

[3] Moore, with the exception of an awkward compliment about her skin tone, when they were alone in an elevator together in late 2013, had done well to keep his distance from McDaniel shortly after their initial meeting and his inquiry into McDaniel's sexual preferences and activity; asking about the nature of her relationship with another black female coworker.

Mr. Moore testified during ORM's investigation that he does not use that language ("Bitch") when he refers to women. (ROI at 167) An Administrative Incident Statement concerning Moore's humiliation of a black female subordinate with whom McDaniel was close includes his use of "Fucking Bitch" which conflicts with Moore's testimony. (Exh. 19) Moore screamed at McDaniel's friend for an hour and a half on two separate occasions, his cutting verbal assault included "No one is going to praise you and give you accolades…You probably won't even make it to my level" , and "Who do you think you are?...No one likes you." Moore was sure to remind her that she was "Black" when criticizing her decision to remove a white a female employee from a prestigious assignment. McDaniel received a phone call from her friend immediately following the first incident; she was sobbing and could barely speak. Moore's pattern of harassment often took the form of humiliation; he proceeded as if his own blackness endowed him with the capacity to put black women "in their place." This is once again seen in the complaint made by a black female job applicant who interviewed with both Moore and Lasic, "I have held my head high and I was proud of what I stood for until this humiliating interview. I allowed Mr. Moore to cut me down and I felt worthless… I am not able to accept the position offered to me at this time because of my experience with Mr. Moore. I could not imagine working for an individual like Mr. Moore." (Exh. 18) Even more compelling is testimony collected during the AIB investigation where Moore offered his race in explanation for why he should be permitted to make sexual comments about black women at work. In his own words, "she was the first African-American I brought into management, and we have a very close and personal relationship." (Exh. 8 at 14) In another instance Moore boasted "Look at the way I'm yelling at you, you don't even work for me. My employees will do what I tell them to do." (*Id.* at 16) In the words of one of his employees, "Charles stood over me, and he said…'I caught you with your panties down around your ankles, and now it's time for you to pull them up and be a big girl and face the music.'" (*Id.* At 15), and another "they screamed at me for

two and a half hours, and then he told me if I didn't take his plea bargain…he would have me fired." (*Id.*at 13) Employees described "management by terror," a culture of fear, intimidation, bullying, and managerial arrogance. (Exh. 8 at 20, 21)

In discussing the objective and subjective elements of a hostile work environment claim, Defendant misstates the substance of the authority by replacing "severe or pervasive" with "severe and pervasive." The standard cited by Defendant actually states that "[c]onduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Lovelace v. BP Prods. N. Am., Inc.*, 252 Fed. Appx. 33, 39 (6th Cir. 2007) Defendant's Motion attempts to draw parallels to *Lovelace v. BP Prod. N. Am., Inc.* in order to categorize this hostile work environment claim as "only a few discrete instances" by misstating McDaniel's claim and ignoring evidence provided in her deposition and in the record of evidence exchanged by the parties.

The pervasive nature of Defendant's unreasonable interference with McDaniel's work performance is clear. On a virtually continuous basis, between January 2014 and July 2015, the harassment by VA managers, in the form of illegitimate personnel decisions, had the direct effect of dramatically altering McDaniel's entire experience of the workplace. In order to continue working, she was forced to subject herself to disparate treatment with regard to the most basic aspects of her job including available work (ROI at 235-236), accessible tools to complete the work (and receive more output credit) efficiently (ROI at 234), and targeted punishments from which other employees were exempt (ROI at 211). This environment severely reduced opportunities for success for McDaniel and decreased her chances of career advancement, and served to put her career in danger. In this way, the facts of this case are more akin to *Bradley v. Arwood* than they are to *Lovelace v. BP Prods. N. Am., Inc.* In *Bradley* the Sixth Circuit found that conduct on the part of a supervisor which

interferes with an employee's work performance in the aggregate may rise to the level of a hostile work environment even though individual actions may not qualify on their own. "A negative performance review, the imposition of a performance improvement plan, or similar actions do not, on their own, show a hostile work environment" *Bradley v. Arwood*, Case No. 16-1034, at *19 (6th Cir. Aug. 29, 2017) but the same actions, as part of a larger context, "could well be viewed as work-sabotaging behavior that creates a hostile work environment." *Id* at *19 (citing *Williams v. General Motors Corporation*, 187 F.3d 553, 563 (6th Cir. 1999))

The severity of the hostile environment requires some analysis. The Supreme Court instructs "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998) (citing *Harris, supra*, at 23) "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 81-82  The important point here is that reasonable perceptions of severity can shift depending on the particular circumstances of the workplace. For instance, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 69 (2006) The distinction made between the two examples listed above (a simple lunch as opposed to a training lunch with career implications) speaks to the Court's recognizing that a workplace annoyance like not being invited to lunch can dramatically increase in significance and severity in the context of a connection to an important consequence (like career success or failure). *See also Luciano v. the Olsten Corporation*, 110 F.3d 210, 214 (2d Cir. 1997) (holding that organizational conduct which is ostensibly

professional and work-based in nature, but "designed to ensure that her performance would be unsatisfactory" can qualify as discriminatory conduct)

It was McDaniel that started the conversation about her performance, not management. Defendant describes a stereotype, not McDaniel. McDaniel didn't cry racism or suddenly claim to be disabled in a cheap effort to avoid justifiable punishment. In this case, McDaniel attempted to start a dialogue about her fiscal year appraisal being just shy of exceptional due to arbitrary standards created by Moore[4]. McDaniel called out the sabotage by Lasic and Moore when her FYTD output average was still well above her standard. McDaniel reached out to Lasic for support and the exact support she said she needed to be successful was withheld. (Exh. 83; Exh. 89) McDaniel reached out to her union and human resources for advice on how to proceed with a grievance as she was completely unfamiliar with the complaint process. As uncomfortable as she was formally calling out her bosses, McDaniel felt it necessary to stand up for herself because she realized her silence would make her complicit in her own abuse. (Exh. 85 p. 69-71) Even when participating in the creation of Memorandums that characterized McDaniel as a poor worker, DiMarco felt compelled to insert some truth when he wrote, "Proactive/take charge attitude. Does not shy away from complex/difficult claims. " which conflicts with the lazy, do nothing, failure narrative being promoted by Moore and Jessica R. Minnich[5]("Minnich") (*Id.* at 66)

---

[4] Moore had opportunity to review performance data for each employee before creating the "exceptional" performance criteria. Moore was permitted to set the standard for exceptional above the marks of whomever he wished. For example, one of McDaniel's co-workers achieved 298 outputs, Moore set the exceptional level just above at 300 instead of 295 which prevented that employee from achieving an overall outstanding rating that year.

[5] Minnich advised McDaniel that she was within time limits to file a grievance of her appraisal rating when she met with her concerning Moore and Lasic on February 26, 2014. After McDaniel filed the appraisal rating grievance, Moore and Lasic retaliated with the false statements, fact-finding, and removal from telework. McDaniel complained by letter on April 2, 2014 making various claims against both, Minnich then refused to investigate McDaniel's complaint and instead put significant effort into preparing a fact-finding report that relied completely on Moore's opinions and conclusory statements.

McDaniel's ongoing battle for sufficient work was exhausting and stressful for her. Her inventory was routinely poached without consequence to her coworkers, and McDaniel had to consider the consequences of speaking up after having been dismissed by the Agency so consistently for so long. (McDaniel Dep. 163; Exh. 2, p.3, ln.23) To DiMarco, "I also hope that my finally coming forward empowers you to stand up for me when management creates special instruction that targets my individual performance." (Exh.101) The last time McDaniel raised concerns about workload management and the negative impact of redistribution, the response by VA managers was to ensure her failure, using the various mechanisms available to them to manufacture and then document a productivity issue for McDaniel, which due to the output focused culture Moore perpetuated effectively removed her credibility, thus permitting them to ignore her and her rights for long stretches of time, even in the instance of the grievance she filed on March 5, 2014, despite the VA/AFGE Master Agreement requiring a meeting within seven calendar days at Step 3, McDaniel was forced to wait over 21 weeks. (Exh. 82 p.243) McDaniel was firmly placed within a terrorized yet invisible second class at the Cleveland RO.

### B. Plaintiff has met the prerequisite for employer's actual or constructive knowledge of alleged harassment because the Defendant produced evidence that Plaintiff reported harassment and announced her membership in the class of employees affected by the harassment.

The VA was notified of harassment when they were informed through Plaintiff's representative, Attorney Denise J. Knecht by letter on June 12, 2014 which reads in part:

**"The Hostile Environment**

Natalie has observed that black females working as VSRs and RSVRs are treated differently than whites and males. Mr. Moore is more critical of black females. Other employees have observed similar situations and discussed their concerns. Mr. Moore has been observed making sexually suggestive comments to other female employees. Natalie was told that one weekend Mr. Moore was heard yelling over the phone at work to his wife, whom he also supervises.

Natalie believes that the unfair recommendation for suspension is at least in part because of biases held by Mr. Moore."  (Exh. 26 page 3; Gov. Exhibit 2 "ROI" at 297-301)

In the course of the VA Office of Resolution Management's (ORM) Investigation into McDaniel's EEO complaint, Defendant furnished a copy of Knecht's letter, annotated by RMO Minnich with brackets emphasizing the section marked *The Hostile Work Environment*. Minnich then made reference to the letter again when she annotated an Organizational Chart that included McDaniel's race "*African-American" and color/skin tone "Olive" with the following: "*Please note Complaint's race is not readily apparent. The Complainant's first-level supervisor and Human Resources did not know her race and believed she may have been Hispanic until the ORM filing and the July 12, 2014 letter from her attorney respectively." (Exh. 56; ROI at 221-222) An insistence that is not supported by the testimony captured by the ORM Investigator (ROI excerpt, Exh. 60), and presumably proffered as some personal defense against accusations of racial discrimination.

A recent Government Accountability Office (GAO) Report found, "VA does not have oversight measures to ensure that all referred allegations of misconduct are investigated by an entity outside the control of the facility or program office involved in the misconduct…managers and staff at facilities may investigate themselves or other allegations where they may have a personal stake or bias in the matter to be investigated. Consequently, there may be an increased risk that the results of the investigation are minimized, not handled adequately, or questioned by the OSC or the individual who made the original allegation." (Exh. 61 p.55) The GAO's assessment rings true in McDaniel's case; when McDaniel elevated her hostile work environment complaint to Under Secretary for Benefits Alison J. Hickey on August 26, 2014 (Exh. 68), the complaint was referred through Ezra "Ed" Safdie ("Safdie"), Director of VA's Office of Management back to Minnich in Cleveland. (Exh. 93) Instead of investigating McDaniel's April 2, 2014 complaint, Minnich spent the next seven days in collusion with Moore who was "overly pleased" with her preparation of a fact-finding report

on McDaniel; the two even discussed concealing Moore's involvement when issuing documents to McDaniel (Exh. 84). Safdie's referral was just another opportunity for Minnich to ignore McDaniel's complaint, but for McDaniel it was her last hope dashed, she was alone and no one was coming to her rescue. The Defendant has not articulated a non-discriminatory reason for the actions outlined in this claim.

### III. THERE ARE SUFFICIENT MATERIAL FACTS TO SUPPORT A PRIMA FACIE CASE FOR DISABILITY DISCRIMINATION UNDER THE **REHABILITATION ACT**

Under the ADA, employers must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an... employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie case for failure to accommodate a disabled employee, McDaniel must show that: (1) she has a disability; (2) she is qualified for the position; (3) the VA knew or had reason to know of her disability; (4) an accommodation was needed; and (5) the VA did not provide the necessary accommodation. See *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir.2004); *see also Gaines v. Runyon*, 107F.3d1171 (6th Cir.1997).

Defendant argues McDaniel has failed to prove a prima facie case of disability discrimination because she has failed to prove that she qualifies as "disabled" under the meaning of the Rehabilitation Act. Under the Act, a disability is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. See 29 C.F.R. § 1630.2(g). To be substantially limited, an employee must be unable "to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include, but

are not limited to "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Courts also analyze Rehabilitation Act claims the same as claims brought under the Americans with Disabilities Act of 1990 (the "ADA").  See *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir.2004). The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual.  42 U.S.C. § 12102(2)(B).  The ADA provides that the definition of disability "shall be construed in favor of broad coverage of individuals ...." 42 U.S.C. § 12102(4)(A).  In 2008, Congress passed the ADA Amendments Act of 2008 ("ADAAA") to "reinstat[e] a broad scope of protection to be available under the ADA."  ADA Amendments Act of 2008, Pub. L. 110-325, 122. Stat. 3553, § 2 (2008). The Act further states that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 12102(4)(D).  The ADAAA regulations provide that the Court should not undertake an extensive analysis in determining whether a plaintiff is disabled because "the primary object in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability."  29 C.F.R. § 1630.1(c)(4). Further, with certain specific impairments, "it should be easily concluded that [the impairments] . . . substantially limit the major life activities indicated." 29 C.F.R. § 1630.2(j)(3)(iii).  Relevant to McDaniel's case, the regulations state that the Court should easily conclude that "major depressive disorder…post-traumatic stress disorder . . . substantially limit[s] brain function."  29 C.F.R. § 1630.2(j)(3)(iii).  The ADA considers "brain function" to be a "major life activity" so any impairment that limits brain function qualifies as a disability.  42 U.S.C. § 12102(2)(B). Defendant's brief only cites pre-ADAAA authority for why McDaniel's disability should not qualify under the ADA. (Def. Mot. Doc #40-1 at 9-10).

19

**i.**  For all the reasons outlined above McDaniel's PTSD and Major Depressive Disorder (MDD) are qualifying disabilities under the ADA.

**ii.**  The record evidence shows that McDaniel was at all times qualified to perform the essential functions of her decision maker position, and was at all times certified and authorized to perform the duties outlined in her position description. McDaniel demonstrated skill and expertise in her work. (McDaniel Dep. at 101; ROI at 368-372; Exh. 36; Exh. 86; Exh. 87) By all accounts McDaniel was an asset to Ohio's Veterans, held in high regard by her coworkers and service members alike. (Exhs. 27, 28, 29, 30, 31, 32, 33, 34, 35, 43)

**iii.**  McDaniel first notified VA that she required reasonable accommodation for a disability on April 30, 2014, the requested accommodation was granted by VA on July 3, 2014 when her counselor provided a letter dated June 30, 2014. (Exh. 88; Exh. 12). On June 8, 2015, McDaniel again requested accommodation for her condition; she submitted a letter dated June 5, 2015 ("June 8th letter") from the same counselor to VA identifying and describing McDaniel's disability. In addition, the counselor attached a two page clinical summary from McDaniel's psychiatrist. (Exh.13; Exh. 9) A reasonable jury could conclude that the VA did have notice of McDaniel's disability and reasonable accommodation request.

**iv.**  The counselor's 200 word June 8th letter informed VA that McDaniel suffered from PTSD, Major Depressive Disorder (MDD), severe and Generalized Anxiety Disorder (GAD). Further, the letter listed her functional limitations, stated that the symptoms of her disability caused her functional limitations, and clearly provided a professional opinion that McDaniel's presence in the work environment exacerbates her condition, reducing occupational functioning, and making it necessary that McDaniel telework as a reasonable accommodation. (Exh. 13, Exh. 9) On June 18, 2015 the VA received a completed VA Form 0857e *Request For Medical Documentation* via fax directly from the counselor's practice which expanded on the information contained in the June 8th letter.

The counselor responded that there was a positive correlation between McDaniel's presence in-office and an increase in the symptoms of her disability (specifically panic attacks and flashbacks). These symptoms, in turn, were the cause of the functional limitations described in the June 8th letter and restated on the VA Form 0857e. With respect to performing essential functions, McDaniel's counselor informed the VA that she was better able to cope with anxiety and the associated functional limitations when working from home, that is, there was a nexus between a safe environment such as her home and McDaniel's <u>concentration, mood, work production, and focus</u>. The counselor also makes reference to McDaniel's recent leave usage and in support of her recommendation notes that taking time away from work had caused McDaniel's work to suffer. (Exh. 15, 15.1) Additionally, McDaniel stated there was a causal link between the condition and the accommodation on June 30, 2018, "…there is not one indication that the symptoms associated with my disability would be reduced in the work environment, when the work environment itself has been identified as a trigger for exacerbation by professionals that have followed me for more than a year." (Exh. 17) "Any alternative accommodation proposed by the employer must be shown to be effective. Documentation from my health care providers has already specified that the only effective accommodation is telework. Furthermore, the ineffective alternative you suggest would be more costly and burdensome on the Agency. " (*Id.*) Thus, the volume of record evidence in support of telework being a necessity to include the opinion of a treating professional is sufficient to necessitate presentation to a jury.

      **v.**      In his attempt to show that he is not responsible for the breakdown in the interactive process, Defendant references *Arndt v. Ford Motor Co.* McDaniel's claim diverges in several material ways from *Arndt*. In *Arndt*, the employer did not deny the requested accommodation, the Sixth Circuit stated that "in neither instance did Ford refuse to provide the requested accommodation." *Arndt v. Ford Motor Co.*, No. 17-1415, at *13 (6th Cir. Dec. 13, 2017) and that "Ford had not reached

any conclusion about the accommodation that Arndt had specifically requested at the time Arndt resigned" *Id* at *15; whereas here, Defendant specifically admits in his Motion that he denied Plaintiff's requested accommodation of telework (Def. Mot. at 12) which, on multiple occasions, McDaniel and McDaniel's healthcare providers explicitly communicated was necessary for Plaintiff to continue working .(McDaniel Dep. at 262-266) Additionally, the Sixth Circuit noted that "The novelty of Arndt's request made it reasonable for his process to take longer than average." *Arndt v. Ford Motor Co.*, No. 17-1415, at *15 (6th Cir. Dec. 13, 2017); whereas here, unlike the complex and potentially unsafe proposition of introducing a service dog on a plant floor, telework was a widely used work-life program and a generally accepted method of reasonable accommodation for employees at VA that required no action on the part of Defendant to implement, which would negate the justification for any delay in this case. The avoidable delay in this case was caused by Defendant alone, in violation of the VA Disability Accommodation Process guidelines. That delay culminated in VA's denial of the requested reasonable accommodation which was deemed necessary by both McDaniel and her counselor. (Def. Mot. at 12; Exh. 15, Exh. 17)

The VA argues that McDaniel cannot maintain an accommodation claim because she did not adequately respond to the LRAC's requests for "sufficient documentation" (Def. Mot. at 3). The interactive process does not permit an employer to demand that an employee or health care provider amend their previous statement as to the necessity of a particular requested reasonable accommodation. If the employee and her health care provider propose an effective accommodation that is objectively reasonable, and the employer refuses to provide the accommodation, then the burden falls on the employer to provide evidence showing that the requested accommodation would present an undue hardship. *Myers v. Cuyahoga County, Ohio*, 182 F. App'x 510, 515-16 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004))

The VA did not participate in the interactive process in good faith. The entirety of the interactive process is captured in a series of emails between Jessica R. Minnich ("Minnich"), LRAC, and McDaniel. McDaniel continually engaged in the interactive process. (Exh. 17) Defendant does not dispute that McDaniel's request to telework five days per week was denied. (Def. Mot. page 11) McDaniel did not refuse to provide additional information the VA needed, but rather, she refused to sign a medical release so that VA could request even more medical information that they didn't actually require to identify 1.) the precise limitations resulting from the disability and 2.) potential reasonable accommodations that could overcome those limitations. In this case, the VA refused to grant her the telework accommodation, despite having the requisite information outlined in 29 CFR 1630.2 (o)(3). The "VA Disability Accommodation Process Overview" (Exh. 45) was provided to LRAC Minnich by McDaniel in an effort to more effectively communicate during the interactive process.

In response to McDaniel's interim accommodation request made on June 17, 2015, Minnich stated only that the counselor's letter was "not sufficient to support telework," and that once the VA Form 0857(e) was received a decision would be made, the form was received the next day but Minnich did not process a decision. Minnich instead advised McDaniel on June 19, 2015 to "stay tuned for more questions" and then proceeded to ask no questions. (Exh. 14) On June 29, 2015, more than 10 days after the submission of a completely filled VA Form 0857e, McDaniel followed-up with the LRAC, despite having sufficient information to support telework for one additional day Minnich instead kept insisting otherwise without articulating a concrete reason. On June 8, 2015 the interim accommodation could have been granted, it was not. On June 17, 2015 the interim accommodation could have been granted, it was not. On June 18, 2015 when Minnich received the form, the interim accommodation could have been granted, it was not. On June 19, 2015 when Minnich emailed McDaniel confirming receipt of the form, the interim accommodation could have

been granted, it was not. Every day between June 18, 2015 and June 29, 2015 VA had the information the LRAC claimed would capacitate a grant of the requested accommodation, it was not granted. On June 24, 2015 when McDaniel, at VA's behest, took leave instead of working from home her interim request was once again denied. Defendant ignored McDaniel's attempts to communicate directly. McDaniel even offered a time to hold a conference call which would include Defendant, McDaniel, and McDaniel's counselor but this request was ignored.

At the end of the work day on June 29, 2015 Minnich invented functional limitations not found in McDaniel's records. By June 30, 2015 McDaniel was worn down, "Your correspondence is a denial of the stressors present in the work environment, and your lack of empathy albeit disappointing is not surprising given my experiences in the work environment over the last 18 months. This experience is de-humanizing, exhausting, and the type of distraction that contributes to a reduction in occupational functioning." (*Id* at 4)

The Sixth Circuit has found that the interactive process "is designed to encourage direct participation on behalf of both the employee and the employer." *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) Defendant failed to participate in the interactive process when Defendant ignored attempts by McDaniel to directly answer and clarify any questions as to limitations and the effectiveness of the requested accommodation. Defendant proposed a collection of alternatives that was not reasonable on its face. Examples include: a wall calendar, full spectrum lighting, electronic organizers, and "[d]evelop strategies to deal with problems." (ROI at 345-346; and Exh. 17 p.4) As the medical documentation from McDaniel's health care providers indicated, and as was confirmed to the VA by McDaniel, none of the alternatives proposed by VA would be effective in minimizing McDaniel's PTSD symptoms and addressing her functional limitations. Telework was a necessary component of any effective reasonable accommodation. (ROI at 354, 363; Exh. 17 at p.2)

Defendant's decision to deviate from established VA policy regarding acceptable time frames for granting accommodations (ROI at 466. and Exh. 37 p. 18), the provision of interim accommodation (ROI at 467. and Exh. 37 p. 19), and limitations on what medical documentation can be requested from disabled employees (ROI at 471, 481; Exh. 37 p. 33 (21.a.)) demonstrates intent on the part of the VA to abandon good faith efforts to participate in the interactive process with McDaniel. Once McDaniel provided medical documentation establishing her disability, describing her functional limitations, and determining a specific, necessary accommodation, any additional requests for medical documentation were unnecessary and constituted undue delay in the accommodation process. Further evidence of VA's disinterest in good faith participation can be found in VA's decision to immediately make contact with General Counsel (OGC) upon receipt of McDaniel's request to telework as an accommodation. Contact with the Regional OGC is ONLY required in the event of a denial, further indication of VA's intention to process a denial for McDaniel with no actual consideration of the request.  (Exh. 17 "privacy log" p.13; Exh. 40 ₱3; Exh. 45 p.24, 28; Exh.71 p.28)

The record evidence documents the significant effort it took for VA to circumvent and misapply the rules, guidance, and resources at its disposal to accommodate McDaniel. The LRAC's self-assessment praises her role as technical advisor on labor relations issues and the reasonable accommodation process (Exh. 44; p.1, 3); LRAC Minnich personally processed 30 reasonable accommodation requests the same year she refused to accommodate McDaniel.

Defendant attributed the following to *EEOC v. Ford Motor Co.,* stating that "An employer is not required to offer a particular accommodation if there is evidence that the employee will not be able to satisfactorily perform her duties with that accommodation." This quote is apparently created whole-cloth and inappropriately credited to the Sixth Circuit. Again, Defendant credits the Sixth Circuit with the following: "When requesting an accommodation to work off-site, a plaintiff must

show that she can meet productivity standards and perform the job as effectively as those on-site."(Def. Mot. 11) which is not found in the text of the authority cited. The Sixth Circuit does speak to the essential functions of a position and states that an employer is not required to alter a job's essential functions. *Equal Emp't Opportunity Comm'n v. Ford Motor Co.*, 782 F.3d 753, 764 (6th Cir. 2015) This is just one important way that *Ford Motor Co.* differs dramatically from this case, at no point does Defendant assert or show that granting McDaniel's request for five days of telework per week would remove any of the job's essential functions or create an undue hardship for VA. Unlike *Ford Motor Co.* where the employee's position was not suited for ad hoc telework due to the essential functions requiring in-person interaction, the practice of telework is widespread in the VA and the position that Plaintiff held was specifically authorized for telework because all of the essential functions of the position can be performed remotely. (McDaniel Dep. at 245; Exh. 38; Exh. 39)

Defendant's comparison to *Ford Motor Co.* is an attempt to portray the scattering of 10 days of active duty in June[6] as a sufficient opportunity period. This was not some pre-planned trial run in the context of the accommodation process used to determine if McDaniel could accomplish a significant increase in her output average. McDaniel's request to telework five days a week was recommended to her by her therapist who was concerned for her stability and well-being; it was not some promise of a higher output average but a chance to stabilize McDaniel and reduce the frequency and degree of her symptoms by first removing the observable dread she felt approaching her in-office day. (Exh. 13) McDaniel's counselor outlined a significant decline in McDaniel's health resulting in referral to a psychiatrist in April 2015, she was first prescribed and then began taking medication for her sleep disturbance, hypervigilance, and anxiety symptoms in late May 2015 (Exh.9; Exh.13), and during the last full week of June she added a medication to which she had a

---

[6] McDaniel was on leave from May 28th 2015 through June 11th 2015 and then took leave again on the 24th and 25th of June. During her absence her supervisor redistributed her workload due to absence. On June 30, 2015, her supervisor reassigned a high output case he knew McDaniel was working on (Exh. 94)

frighteningly negative reaction, severe enough that she narrowly avoided an inpatient stay, when she sought emergency treatment. (Exh. 10, Exh. 11)  In citing *Ford*, Defendant attempts to draw a correlation between the quantity of work produced over the course of those 10 days in June, only five of which were worked consecutively, and where the work was completed, ignoring every other possible explanation including the one found in her counselor's opinion that "…her work environment exacerbates her symptoms which leads to less function in occupational workplace, causing client to take time away from work, and her work to suffer." (Exh.13, Exh. 15-15.1).

VA produced evidence showing not only that telework had a positive impact on productivity, but confirmation that 74 out of the 91 Rating Board members routinely worked at home at least four days per week. (Exh.38) Defendant continues to be evasive with respect to reasonable accommodation records, however a roster archive from May 27, 2015 confirms at least five VSC employees (all are white) were working at home as an accommodation at that time. (Exh. 16) At least fourteen other VSC employees have been granted telework for four or five days per week for medical reasons, further, those employees were not subject to removal for a decline below their performance standard, which is reasonable of course because performance can be addressed regardless of where work is completed (Exh. 20 p.7) Without the Court's intervention, McDaniel will be unable to present this evidence at trial. Of note, Defendant produced records confirming that five day per week telework was granted to at least one VSC employee (also white)for a period of one year for a temporary condition, days per week were reduced to four the following year . (Exh. 22; Exh. 23) McDaniel's disability accommodation request could have been addressed in the same way, which is, treated as a temporary exacerbation that could be accommodated immediately, and then revisited to discern effectiveness and adjusted through an ongoing interactive process.

If Minnich was actually attempting to address/correct a performance issue, her method does not comport with her own training (Exh. 71 p.29, 31.; Exh. 41 (7); Exh. 42 p.11), (Exh. 48) or the

opinion of the RO Director who reviewed the counselor's letter and advised Minnich with respect to McDaniel "no matter where she works performance must be addressed", a statement consistent with VA policies and EEOC guidance, on the subject. (Exh. 49), (Exh. 37 p. 21, 23; Exh. 40; Exh. 41; Exh. 45 p.29 Exh. 103 p. 6  ¶3) There was no requirement to deny the telework accommodation. McDaniel still maintains there was never a bonafide performance failure, and certainly no performance concern that would be cured by a return to the RO. The record of evidence shows that without the requested accommodation, McDaniel would have been unable to perform the essential functions of her job, but with the requested accommodation of five days of telework per week, she would be better able to cope/manage her symptoms and be capable of performing the essential functions of her job. (McDaniel Dep. at 261)

"Once an ADA plaintiff establishes a prima facie case for failure to accommodate, 'the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs.'" *Myers v. Cuyahoga County, Ohio*, 182 F. App'x 510, 515-16 (6th Cir. 2006) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)).  Here, the VA makes no argument that granting telework for five days per week would cause undue hardship.

The VA thwarted the interactive process when the Agency refused to provide the interim accommodation of one more day of telework per week despite ample opportunity to do so, and then terminated the process entirely when McDaniel's removal from telework was framed as a "valid business reason" to both McDaniel and her counselor. The letter sent to McDaniel's counselor was beyond the pale. (ROI at 365-367) McDaniel contends that the breakdown in communication is attributable to Defendant only; given the material facts in dispute and the evidence in support under this element, McDaniel's claims made under the Rehabilitation Act should proceed.

### IV.MATERIAL FACTS EXIST TO SUPPORT A PRIMA FACIE CASE FOR
## CONSTRUCTIVE DISCHARGE

To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined. E.g., *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. *Moore v. Kuka Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)

In *Talley v. Fa. Dollar St.*, the Sixth Circuit has held a reasonable jury could infer that an employer who denied a reasonable accommodation, forcing an employee to work in excess of her medical restrictions would reasonably know that the employee's working conditions would become intolerable to a reasonable person suffering from her particular disability. *Talley v. Fa. Dollar St.*, 542 F.3d 1099, 1109 (6th Cir. 2008), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.,* 129 S.Ct. 2343 (2009); *see also Smith v. Henderson*, 376 F.3d 529, 537 (6th Cir. 2004)  Similarly here, McDaniel's discharge was reasonably foreseeable due to the statements made by McDaniel during and directly preceding the interactive process (Exh. 47; Exh. 17) as well as the phone call documented by her first-line supervisor, occurring June 19, 2015, "It was crystal clear to me that she was experiencing a very difficult mental event." (Exh. 73)

On June 30, 2015, McDaniel reminded VA that her counselor gave a professional opinion that her mental health condition required that she be provided telework as a reasonable accommodation, and directly informed VA that "[i]f a person is cleared to work from home with a reasonable accommodation, interim or otherwise, and the Agency chooses to deny the

accommodation, the effect is refusing that employee's ability to work." (ROI at 354) This statement gives Defendant little room to assert that McDaniel's discharge was not a foreseeable and intended result of denying the requested reasonable accommodation and forcing McDaniel to choose between her mental health and work.

Her choice of phrasing in her resignation, grants further insight into her belief that she was powerless against VA's demand that she return to the office effective July 6, 2015, "You are dedicated to creating and maintaining an untenable situation. I am left with no other option than to resign from my employment with the Department of Veterans Affairs effective immediately." (ROI at 378)

Within an hour of McDaniel's email, Minnich instructed VA managers "We do not need/want to exacerbate this by engaging, holding her hand or talking her into staying." (Exh. 50) This unambiguous statement gives a clear indication of VA management's intent and desire for McDaniel's discharge.

If, the employer repeatedly refuses to accommodate an employee in the face of repeated requests, the employee's leaving the job can be considered an actionable constructive discharge. *Hurtt v. Int'l Servs.*, 627 Fed. Appx. 414, 421 (6th Cir. 2015). Because the location would trigger McDaniel's intolerable mental distress it was impossible for McDaniel to complete the duties of her position in the work environment. As a result of this final discriminatory act on the part of the VA, McDaniel suffered an adverse employment action.

## CONCLUSION

For all the reasons set forth above, Plaintiff respectfully requests that this Court DENY Defendants' Motion for Summary Judgment in its entirety, and allow this case to proceed to a jury trial.

Respectfully submitted,


*/s/ Natalie A. McDaniel*
Natalie A. McDaniel
2352 Demington Drive
Cleveland Heights, OH  44106
 E-mail: nmcdaniellaw@gmail.com
*Pro Se Plaintiff*


## CERTIFICATE OF COMPLIANCE

It is hereby certified that this Memorandum in Opposition to Summary Judgment consisting of 30 pages complies with the requirements set forth in Local Rule 7.1(f), and Judge Nugent's Order dated November 30, 2018.


Date: December 7, 2018

*/s/ Natalie McDaniel*
NATALIE A. McDANIEL
*Pro Se Plaintiff*


## CERTIFICATE OF SERVICE

I certify that, on December 7, 2018, a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Natalie McDaniel*
NATALIE A. McDANIEL
*Pro Se Plaintiff*